Madam Clerk, please call the second case. 215-09-79 Elysia v. Wal-Mart Associates Good morning. Morning. May I please have the floor? Counsel, great to see you. Everything I wanted to say today, I've put in my briefs. Tell us who you are. Oh, I'm Kurt Nierman, representing Eddie Lesure. Thank you. We lost at the Commission after we had a great win in front of the Arbitrator. A 14-page, single-space decision. Going through all the items, going through the disputes, analyzing the case in a great way. And actually, if you look at the dissenting Commissioner's opinion, and one of the reasons I actually took this case up this far is because the dissenting Commissioner points out a number of things that the two reversing Commissioners were doing that weren't appropriate. They were looking to find a way to get around interstate scaffolding, to cut off the DTD based upon, you know, a false claim that the guy did something to someone in the workplace. Secondly, they weren't really analyzing the case evidence. They weren't actually realizing what was happening from a treatment standpoint. And they didn't actually analyze the merit of the two opinions, the analysis provided by the two testifying... Dr. Lorenz provided the causal connection opinion. Correct, he did. Can you hone in on one thing? There seems to be the issue in the Commission, you're alleging sort of cherry-picked the decision, but was there an issue of whether or not the cervical injury was mentioned later? He didn't hit his head. Is that a red herring? How do you deal with that? The Commission seemed to hang their head on that. He was being treated for his arm and really didn't mention cervical problems until later. Right. Those are two different components in my brief. I mean, the head strike is one of the issues that they said, hey, your guy claims he had a head strike. You must lend Dr. Lorenz about that. Therefore, because Dr. Lorenz didn't understand what happened during the accident, we can discount Dr. Lorenz's causation testimony. The reality is you go back and look at Dr. Lorenz's initial note with this guy. The guy fills out an intake sheet. He says nothing about hitting his head. Dr. Lorenz's typewritten note says the guy doesn't know whether or not he hit his head. All he did was fall. You look at Dr. Chudik, which is Lorenz's associate. He saw him before he saw Dr. Lorenz because Dr. Chudik is the arm guy who referred him over to Lorenz when the arm treatment wasn't resolving the arm problems, the arm symptoms. There's nothing in there about the guy striking his head either. What the Commission did was they said, you lied to your doctor about a head strike. He was confused about that. Therefore, we can throw in his causation opinion. Now, the problem with that analysis is that they elevated this head strike, red herring, into reversible territory. The way that they did that is they felt that they could throw out Dr. Lorenz's testimony. When Dr. Lorenz told us on direct and on cross, he wasn't confused about a head strike. In fact, his causation testimony was offered in response to a hypothetical setting up all the undisputed evidence in the case up to that point. So you're saying that Lorenz directly answered that issue as to whether or not he was confused. He said, yeah, because the head strike was not a component to the hypothetical where he said there was causation. And he admitted that his notes said the guy's not sure whether or not he struck his head. But the head strike is even more of a red herring because the eye-meet doctor for the employer said, when you fall back like that, you expect to hit your head. But it wasn't material to his analysis either because he never used the head strike as a basis for denying causation or establishing causation or any aspect of the case. And the reason for that is falling back and having the neck adjust itself suddenly is the whiplash mechanism of injury that we see all the time. So there's no surprise whether the guy struck his head or not. It's immaterial to the case. Well, Bernstein obviously had an opposite opinion. But did Bernstein agree that the claimant's fault could have jarred the cervical spine? Absolutely. He said it could have jarred the cervical spine. He admitted that arm numbness that the guy had 15 minutes following the accident and inability to use the wing was consistent with the specific cervical levels that Dr. Lorenz was treating, C5-6, C6-7. Dr. Bernstein, in fact, said, under my analysis, the way that I put this together, and I don't think there's a cervical injury, he said, I can't explain why the guy had numbness for 15 minutes following the accident. My analysis doesn't embrace that.  Overlooking the most immediate symptom following the accident. So Dr. Bernstein admits he couldn't causally relate the numbness to anything. He did mention brachial plexus. Now, here's a bigger point, you might think. This is against the manifest way of the evidence. The two commissioners who overturned this relied upon evidence that wasn't actually in the record. They came off and substituted a diagnosis which nobody made in the record, this brachial plexus injury, where Dr. Bernstein said brachial plexus can cause some numbness in the arm. The problem with that adoption of that diagnosis in favor of cervical injuries, the source for the complaints down the arm and eventually the neck issue, is that nobody diagnosed a brachial plexus injury. Dr. Bernstein admitted he wasn't making that diagnosis. Dr. Bernstein said, look at the electrical tests. That will tell us whether or not there's damage to the brachial plexus. Electrical tests were negative. So there's no evidence from testing that there was that. And then the anatomic distribution for brachial plexus injuries commonly present themselves as numbness in the two molar fingers as opposed to the entire hand or the entire arm. Dr. Lorenz told us that that wasn't the presentation Mr. LaSure had following the accident. So we have a diagnosis nobody made. We have a diagnosis that wasn't confirmed by testing. We have a diagnosis that doesn't make sense from an anatomical standpoint. But the commission used that brachial plexus diagnosis, and they took that diagnosis and put it in place of a cervical injury diagnosis, which explains everything because, as you know, Dr. Bernstein admitted that mechanism of injury jars the neck. Those cervical levels are relevant to this distribution of complaints, and he had it immediately following the accident. The discogram identified those two levels in the neck as the source of the pain. You know, they inject this pressure, and the dying stuff increases pressure and causes pain. It's completely consistent with the discogram findings. And then Bernstein says, I can't connect the arm or explain the arm through my analysis of this case. So the commission, by substituting this fake diagnosis, the imaginary diagnosis, for the most logical explanation as to how all this comes together, especially given the fact that we had a series of arm treaters, you know, arm specialists, who kept focusing treatment towards the arm, which didn't resolve the complaints. Okay, the specialist couldn't correct the arm problems because it wasn't an arm problem. It was coming from the neck, as we know from the discogram that was done four months later when he got in the hands of the neck specialist. So the way it unfolded, we have company clinic doctors, we have arm specialists, we have the guy going in and getting his own arm specialist, Dr. Chuck, to see if these guys are doing the right thing. And then we have these company clinic arm specialists saying, you know, we should be looking for something else here because we're not alleviating the problem. And the arm doctor thought there was a cervical component, correct? Chudnik? Chudnik did, yeah, Dr. Chudnik did. He found a positive Sperling's maneuver, which actually showed up equivocally in the prior doctor's records. The prior doctor at the company clinic said, you know, we should look for something else because we've been focusing on the arm that's not taking care of the problem. So, yes, we have a four-month delay before it gets to the neck doctor, but the neck doctor works it up, finds the diagnosis, all the testing is consistent with it, the arm treatment doesn't take care of the problem. Dr. Bernstein comes up with a theory that he can't support the initial complaints with, and this four-month delay thing that the commission also looked at, or at least counsel talked about in brief, we have a peppering of cervical-related complaints throughout the treatment. I mean, we have this, the arm, which is consistent with the cervical. We have neck tenderness found one week later in the physical therapy evaluation. We have another reference to limitation and range of motion of the neck in March. And I cite all this in the brief. I'm not going to give you the exact dates because it's all in the brief. So we have a peppering of cervical-related complaints throughout the four months before this guy got to Dr. Lorenz. But everybody's looking at the arm because that's their specialty, and Lorenz admitted, you know, everybody's looking at the arm. Finally, they figure out that's not doing the right thing, so they send him to me. Yeah, because he's a claimant. He doesn't even know what the source of his medical problem is, right? Well, he can't. He can't. He's a 70-year-old guy, and he's working at Walmart, and life is not as good as it could be. So here's where we are. And I think what might have distracted the commission is this attack against the guy's credibility based upon something he supposedly did at work, you know, this harassment issue. But if you look at what they brought to the table during the trial, he denied that any of that happened. If you look at what they brought to the table during the trial, there's a charging document. I think it's a PF-19 code under the Walmart policy, which covers everything imaginable under the sun as to what you can be charged for. But it doesn't say you harassed someone. There's no charging documents, no witness statements, no witnesses, no one with any knowledge of what happened came in to testify that the guy actually did any of this stuff. And that was where the commissioner was throwing out the language about red flags and bright flares light up the sky. You know, you've got to follow the law. And he's saying his cohorts are not following the law. They're not looking at the evidence. How old was the claimant again? He's 79. He was 63 at the time of this accident. He was a little dazed by the fall. And so I would ask that you reverse the case. And not just reverse it. I know you're going to be compelled or feel compelled if you reverse it to remand it back for more findings by the commission. My concern with the commission, the commission has shown itself, in my opinion, to be unable to do what they're told to do at some points. For example, this Pittman v. Crochelle case that you guys reversed for us two years ago, it took them a whole year to follow what you told them was the right way to follow. And I'm concerned with what's going on over there, that unless I have a good explanation as to what should be done and why their avenue was incorrect, we may not get a decision out of the commission that would prevent us from coming back up here again. So I'm just trying to avoid setting a trip up here. If you decide to reverse, which I hope you do. Thank you. Thank you, counsel. Counsel, you may respond. Good morning. May it please the Court. Counsel, I'm Nicole Schwer, the attorney for the appellee in this case. As we all know, the issue here today is whether the commission's decision was against the manifesto of the evidence. We're not here today to reweigh the evidence, as I believe counsel has asked you to do today. The question is whether there was evidence to support the commission's decision that the cervical spine condition is not causally related to the fall. Now, before going through what I believe to be a well-reasoned decision and their main reasons for finding the cervical spine condition not related, I think it's important that we touch on the fact that we have a documented left shoulder injury. Nobody has ever testified, and I don't believe counsel has a dispute, that there is a left shoulder condition. There's an MRI that revealed a partial thickness rotator cuff tear. The MRI demonstrated a fusion. Physical examinations of the shoulders since the first evaluation have documented objective findings with regards to the shoulder. Additionally, at no point did any of the doctors say, I don't think his symptoms are related to the shoulder. I don't think he has a shoulder injury. In fact, if you look at the record and you look at the intake form, which counsel actually referenced, he was referred to Dr. Lorenz for his neck, the very first cervical spine examination, by his lawyer. We never had a doctor say, I don't think that there's any symptomatic left shoulder pathology. Now, the commission found Dr. Bernstein's opinion to be more credible than the opinion of Dr. Lorenz, and one of the findings that they found very significant, that I do as well, pertains to the medical records. Dr. Bernstein actually reviewed the medical records. Dr. Lorenz did not. He admitted during his deposition that he never reviewed any of the medical records prior to his evaluation. Additionally, Dr. Bernstein looked at these medical records, and he found that gap in time between the fall and the complaints of the neck pain to be significant. We're not talking a couple days. We're not talking a week. We're talking months between the fall and the onset of the cervical spine complaints. Additionally, Dr. Bernstein found that the MRI of the cervical spine was age-appropriate, was age-appropriate to generative changes. He did not find any evidence of an acute injury. Did Bernstein acknowledge that the fall could have caused the cervical problems? Well, actually, I was actually just about to answer that question, so it's a very good question. When we discussed the numbness in the arm, Dr. Bernstein never said that in this particular case, this specific numbness could have been related to a cervical spine injury. What Dr. Bernstein testified to is that numbness in the arm can be due to a shoulder injury, which we actually have here, brachial plexus injury, or a cervical spine injury. But what he went on to further elaborate and to say is that in this instance, numbness in the cervical spine would not correlate to any pathology that he particularly found with regards to the MRI and with regards to the physical examination findings. He said, yes, numbness in the arm can, but it's going to depend where it's at. Did he diagnose a brachial plexus injury? He did not. Did any doctor? No doctor actually diagnosed a brachial plexus injury. But what the doctors did discuss is why would we have maybe had this arm numbness? Because we know we have a shoulder injury. There's no dispute. But why would there have been this numbness? And actually, if you look at the testimony of Dr. Lorenz and Dr. Bernstein, they provide a very well-reasoned explanation for that. Dr. Bernstein says that a shoulder injury can cause brachial plexus symptoms, whether it's due to the inflammation in the shoulder that could be, you know, impinging within the shoulder. Dr. Lorenz himself even indicated that, number one, shoulder pain can radiate to the elbow and the forearm, and that it's not unusual to have a brachial plexus condition temporarily when you enter your shoulder. Now, I understand that the EMG months later was normal, normal of the upper extremity. However, they all testified that maybe this brachial plexopathy could be normal or, excuse me, could be temporary. Additionally, Dr. Lorenz testified that tingling in the fourth and fifth fingers is not indicative of a cervical spine injury or cervical spine pathology, but rather something like brachial plexus or a stretch injury when somebody falls on their arm, as is what happened in this instance. Now, counsel alleges that the medical records do not support a finding that there were complaints of fourth and fifth finger numbness. I would point you to the medical records, which actually show multiple instances where he complained of these fourth and fifth finger numbness, which Dr. Lorenz himself indicated was non-dermatomal to the levels that he is alleging are causing Mr. Leger's current symptoms. I mean, how do you respond to this, reducing it to the simplest terms? Part of his argument is, hey, look, the treatment initially focused on the claimant's left shoulder and arm, but it never really resolved his problem. Well, I think, first of all, Dr. Bernstein does not believe that he has a condition that would warrant surgery or treatment. I'm not talking about surgery or treatment. I'm talking about the source of the problem. Yes, so I believe that we can have a shoulder injury that unfortunately is not something that's surgically repairable, and that's what Dr. Such herself indicated, that he had this shoulder condition, he had this partial tear, we have all these objective findings with regards to the shoulder, scapular winging was one of the biggest issues that she noted. But she said he wasn't, unfortunately, a surgical candidate. Now, I think as to whether or not he's a surgical candidate for the shoulder or why does he still have these ongoing shoulder conditions, I don't think would be an issue here, because that issue here is whether the decision is against the manifest weight of the evidence. And the commission reviewed all of those findings. The commission reviewed the left shoulder complaints versus the cervical spine and still found that Dr. Bernstein was more credible, that they did not believe that the cervical spine condition, if it is present, was causally related to that fall. So I think that's something that we need to keep in mind as well. Number one, I don't believe that there's a cervical spine condition. I think Dr. Bernstein's opinion is very well reasoned. But nonetheless, the commission found that it would not be related to that fall. And we point to the medical records in the first complaints. When you look at that very first evaluation, Mr. Lesher denied any other complaints except for the shoulder. They actually did a physical examination at that point. What would he have noted? Is it that unusual that somebody said a jarring hit and falls down, you know, and they go right to the registered doctors? Did they really know the source, the whole source of their problems? Well, I think what's relevant with that are his complaints. He denied any other issues except for the shoulder, a negative Spurling's test, a normal cervical spine range of motion, and a normal cervical examination. So those are the objective findings, not necessarily whether he knows whether it's the shoulder or the neck. But what's significant is that at trial he testifies and he tells Dr. Lorenz, I had neck pain. I had neck pain immediately after the incident. I had limited cervical range of motion, and I also had ongoing numbness since the fall. Now that's completely contradicted by the medical records in their entirety. They never once referenced any of this neck pain. Now, counsel talks about the head strike, and he makes a big deal about the head strike. But what the commission actually says is that he complained of neck pain and striking his head. Nobody has ever alleged that the head strike is essential to determining whether or not the neck is related to the fall. The issue goes to the credibility. I think that's what the commission saw. We have multiple instances where Mr. Ledger's trial testimony is completely contradicted by the medical records. And that's significant because Dr. Lorenz himself indicated that he relied in part on Mr. Ledger's statements that he had neck pain immediately after the accident in assessing his causal connection opinion. He even indicated, and I quote, that he would, when discussing whether or not there was an aberration of a preexisting cervical spine condition, he said, I quote, he would feel much more comfortable if there were some immediate issues with regard to the arm and the neck. Now the evidence surrounding that immediate fall do not support any issues with regards to the arm and neck. And Dr. Lorenz himself even indicated that pain going down the arm could be attributed to a shoulder injury. Again, he indicated that the fourth and fifth finger findings were non-dermatomal for a cervical spine issue. And I think the credibility here is really important because Dr. Lorenz bases a very significant portion of his argument on that immediate onset of neck pain. And he never reviewed the medical records. I think had he had an opportunity to review the medical records, he would have been able to see that they don't support Mr. Ledger's assertion that he had this neck pain immediately. But again, you know, I think here we're also dealing with manifest weight of the evidence. The commission weighed all this, and they found that the cervical spine condition was not related to that fall. Now, counsel also talks about the issue with the sexual harassment, and he was terminated for sexual harassment. Does that have anything to do with this case? That was going to be my point, Your Honor. You know, at this point, the commission did not award any or deny any TTD that would be in violation of interstate scavenging. It's standard fall on the merits of the evidence, not only the gap in employment. I would agree with you completely, Your Honor. I do not think that at this point the sexual harassment or the TTD is at issue based on the commission's findings. And, you know, generally I do think that... What do you mean, the sexual harassment? The sexual harassment termination? He was terminated for sexual harassment, and there was an issue at trial with regards to whether or not... I mean, was he ever found guilty or judged guilty of it or anything? There was no evidence introduced at the time of hearing. So it's an allegation. An allegation of sexual harassment. I think that's a little appropriate, more appropriate. We've got to be very careful about that. I apologize, Your Honor. The termination was with regards to that finding, but absolutely in no way are we alleging that it was a criminal conviction. That's correct. But again, I do not think that the TTD issue is at issue as we stand here today. But nonetheless, I do think that the commission reviewed all of the evidence. I think a close review of the record, a close review of the trial testimony, of the complaints within the medical records supports that there was this gap in complaints. Dr. Bernstein's opinion was well-reasoned. He had more information than Dr. Lorenz with regards to the complaints immediately after the incident. And I do believe that the commission's decision is supported by the evidence, and I would ask that you find that it was not against the manifest weight of the evidence. Thank you. Thank you, counsel. Counsel, you may reply. Thank you, Judge. I'll be quick. I apologize. There's so much to unpack there. We have a left shoulder injury. There's no doubt about that. We have a tear found on an MRI. No treatment resolves any of the complaints. So that clearly wasn't the source of the problem. We have, like Dr. Lorenz wanted, immediate symptoms referable to the cervical spine following the accident. We have complete numbness down the arm. We have an inability to use the wing for 15 minutes following the accident. It's only explainable through a cervical injury at the right levels. Dr. Lorenz did not say the fourth and fifth are non-anatomic for a cervical injury. He said the fourth and fifth are anatomic for a brachial plexus injury. And because he didn't have a fourth and fifth presentation, a fourth and fifth finger presentation, it could have been brachial plexus. It follows, in addition to the testing, in addition to everything else. So, yes, we had a left shoulder injury. The point of the case, though, is the cervical spine, obviously. The scapular winging is also a finding which both doctors say is consistent with cervical injury. Okay? So the fact that the guy had scapular winging throughout that four months before he got to the neck specialist, that's consistent with the cervical spine the shoulder treatment didn't deal with. Dr. Lorenz, in fact, said that, and this is the big mystery of all this, the commission never identifies where Dr. Lorenz's opinion is incorrect. They say, well, Dr. Bernstein looked at all these records ahead of time, or the records before he got to see him. But Dr. Lorenz knew the guy, may or may not have hit his head. He knew that the arm doctors had been treating the arm rather than the neck. He knew he got the referral from Dr. Chuck, not from me, to see Dr. Lorenz. I'm identified on the sheet, I'm sure, as the guy's attorney. But that's how the sequence of treatments should play out. The arm doctors can't figure it out. They don't fix it. You send them to the people that have the explanation. That's how it gets to Dr. Lorenz. Substituting a fake diagnosis has to be a violation of manifest weight. The three findings that they attribute to this guy testifying to on pages 12 through 14 of the transcript are absolutely incorrect. They mischaracterized the testimony. That has to contribute to the idea that this is a manifest weight violation. The arbitrator's decision was well-reasoned, 14 pages, single-spaced, analyzed everything. We hope that you reverse, I ask that you reverse the commission finding, and reinstate the arbitrator's finding. If you can't do that, give the commission some idea of what they should do, if you would. Thank you. Thank you, counsel, both, for your arguments in this matter. It will be resolved through written disposition. We'll stand at brief recess. Excusez-moi.